**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| CYPANGA SICAV SIF, Individually and on Behalf All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>      v.<br><br>FISERV, INC., MICHAEL P. LYONS, and ROBERT W. HAU,<br><br>                    Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**

Cypanga Sicav SIF ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Fiserv, Inc. ("Fiserv" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, conference calls, and media reports issued by and disseminated by Fiserv; and (c) review of other publicly available information concerning Fiserv.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Fiserv securities between July 23, 2025 and October 29, 2025, inclusive (the "Class Period"), against Fiserv and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Fiserv is a Milwaukee, Wisconsin-based global payments and financial technology provider. In July 2025, Fiserv revised its 2025 guidance, including lowering its organic revenue growth guidance. Fiserv told the market that its guidance changes were based on a review, termed a "re-underwrit[ing]," of the Company's new initiatives and products. The Company told investors that although certain of those initiatives and projects were delayed, they were fundamentally sound.

3. Unbeknownst to investors, Fiserv's representations to the market in July 2025 were false and misleading. As Fiserv would later admit in October 2025, the Company's 2025 guidance disclosed in July 2025 was based on "assumptions . . . which would have been objectively difficult to achieve even with the right investment and strong execution."

4. Moreover, Fiserv's "re-underwrit[ing]" of its initiatives and products turned out to have focused only on its largest offerings and was not comprehensive. After Fiserv actually conducted a comprehensive review during the third quarter, it concluded that its initiatives and products "place[d] too much emphasis on pursuing in-quarter results as opposed to building long-term relationships." Thus, Fiserv announced in October that it "made the decision to deprioritize the short-term revenue and expense initiatives," which would negatively impact the Company's short-term "growth and profitability."

5. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company is headquartered in this Judicial District.

9. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

**PARTIES**

10.     Plaintiff Cypanga SICAV SIF, as set forth in the accompanying certification, incorporated by reference herein, purchased Fiserv securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.     Defendant Fiserv is a Milwaukee-based global payments and financial technology provider. Fiserv's common stock trades on the New York Stock Exchange ("NYSE") under the ticker "FI."

12.     Defendant Michael P. Lyons has served as the Company's Chief Executive Officer ("CEO") and a member of its Board of Directors since May 2025.

13.     Defendant Robert W. Hau served as the Company's Chief Financial Officer ("CFO") from March 2016 through October 2025.

14.     Defendants Lyons and Hau (together, the "Individual Defendants" and together with the Company, "Defendants") because of their positions with Fiserv, possessed the power and authority to control the contents of, among other things, Fiserv's earnings conference calls. The Individual Defendants were provided with copies of Fiserv's press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then

3

materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

**SUBSTANTIVE ALLEGATIONS**

15. Fiserv is a Milwaukee, Wisconsin-based global payments and financial technology provider. The Company operates through two main segments: (i) Merchant Solutions, including Fiserv's Clover payments processing platform; and (ii) Financial Solutions, under which the Company provides account and credit card processing and digital banking services to financial institutions.

16. On July 23, 2025, Fiserv filed a Form 8-K with the SEC attaching a press release announcing the Company's second quarter 2025 results (the "July Press Release").

17. The July Press Release "made several refinements to [Fiserv's] guidance based on [its] year-to-date performance and current business activity levels."

18. Specifically, the July Press Release lowered Fiserv's 2025 guidance for organic revenue growth to 10% and modified its 2025 adjusted earnings per share ("EPS") to a range of $10.15 to $10.30 per share, representing growth of 15% to 17%.

19. On July 23, 2025, Fiserv also conducted its Second Quarter 2025 Earnings Conference Call (the "July Earnings Call"). During the call, Fiserv's CEO, Defendant Lyons, explained that the Company had made "refinements" to its 2025 guidance.

20. Defendant Lyons explained that the "updated guidance reflects the fact that some [product] launches and [strategic] initiatives are taking longer than [Fiserv] had planned." Defendant Lyons said that "[s]ome of that [delay] is on [Fiserv]," but that the Company was "confident that [it] will capture the full strategic and financial benefits and only the timing of realizing them has been extended."

4

21.     As a result, Fiserv: (i) "refined [its] full year organic revenue growth guidance to approximately 10%, which is at the low end of [its] guidance range"; and (ii) raised the bottom range of its EPS guidance by $0.05, based on its "revised ramp in revenue growth in the back half, continued margin improvement and the increased share repurchase guidance."

22.     As to the revenue growth guidance "refinement," in response to an analyst question, Defendant Lyons explained that he had been CEO "for about 10 weeks" and "had the opportunity to better understand the key drivers of [Fiserv's] business, the status on the strategic initiatives and then what was embedded in the full year [2025] guidance."

23.     Defendant Lyons further stated that Fiserv's prior 2025 guidance "anticipated a big ramp in growth in the back half of the year based on the rollout of a whole bunch of projects and initiatives." Defendant Lyons explained that the list of projects and initiatives was "granular" and "very strong" and that he "had the ability to re-underwrite, study all of [the Company's] initiatives, and they are great initiatives," but "[i]t's just a matter of the timing of getting them to market."

24.     Defendant Lyons added that Fiserv was "still confident [the Company would] get the full financial and strategic benefits of all those initiatives. And it's just a matter of timing. And again, we feel very good about them. The pipelines around the products that we're coming to market with are very strong. The clients want them. The technology is good. So we feel very good about it."

25.     Defendant Lyons went on to say that "the refinement from 10% to 12% to 10% is just having the benefit of 6.5 months into the year, understanding where we are in those product rollouts and then importantly, understanding how we want to roll them out with the quality which we want to roll them out. So forecast from here indicates back half of the year growth of 12%, which led us to . . . the lower end of that original range."

26.    Defendant Lyons concluded his answer to the analyst's question by stating that his answer was "the type of transparency we want to give you as we go through the year and see stuff and are able to narrow the range and the variability around it."

27.    Another analyst was not satisfied with Defendant Lyons' answer and asked for "a little more detail on what initiatives are being extended exactly" and for Defendant Lyons to "give a little bit more understanding on [his] conviction on the new outlook."

28.    Defendant Lyons responded:

As I was just saying, we went into the year, the year was built on a back half of the year plan with a lot of granular, very attractive, very compelling initiatives, no major 1 or 2 items, but a very long list of initiatives. And as you go through the planning and have the benefit of half the year and you look at where the rollout of those initiatives are in terms of timing and how we want to do it in terms of quality for the client, scalability and a client-first mindset. And then you roll forward the rest of the year, it puts us at the bottom end of the original 10% to 12% range just in getting those products to market and realizing the revenues. There isn't a quality issue with them. It's not products that have gone to market and not generated the revenues we thought it's just getting the products to market. And as I said, some of that we control. We can execute faster, better, greater sense of urgency and some of it we don't because we're integrating with partners, contract signings, how do people respond to an uncertain macro in the second quarter, obviously, more clear now.

So lots of factors that go in there. what we did with this is we said when you look at our most current plan in the rest of the year, we're confident that we've captured what we will roll out and realize in revenues this year. And then importantly, as you go forward, all of those initiatives, as I said, we've had a great chance to re-underwrite them, restudy them, and they're good. They're really great products, whether we're redefining how small businesses manage cash with CashFlow Central. We're resetting the parts of how small businesses run their businesses off the Clover platform and the attributes we're going to there. We're introducing a digital payment trail, FIUSD. These are all great products resetting our digital platform in banking.

So we like all the products. It's just we're giving you the most updated look on timing. And obviously, when we started the year, you give a wider range. And as you go through the year and get a better sense of where things are, we're able to narrow the range a little. I think to a lesser extent, we started the year with some macro assumptions around certain activity levels in parts, more so in the FI business where card accounts on file would rebound off a cyclical low. You'd see greater activity in certain of the digital payment sites and maybe a faster and more robust upgrade cycle in certain parts of core and surround bank technology. And obviously,

while it's strong today, the economy has taken an uneven path to get here, and we just factored that into the future outlook.

29. On October 29, 2025, Fiserv filed a Form 8-K with the SEC attaching a press release announcing the Company's third quarter 2025 results (the "October Press Release"). The October Press Release reported Fiserv's third quarter 2025 EPS of $2.04 per share and $4.9 billion in revenue, both of which fell short of analysts' expectations. The consensus estimate for Fiserv's EPS was $2.64 per share and for revenue was $5.36 billion.

30. The October Press Release also lowered Fiserv's 2025 guidance for organic revenue growth to a range of 3.5% to 4% and its 2025 adjusted EPS to a range of $8.50 to $8.60 per share.

31. On October 29, 2025, Fiserv also conducted its Second Quarter 2025 Earnings Conference Call (the "October Earnings Call").

32. During the October Earnings Call, Defendant Lyons explained that Fiserv's disappointing third quarter 2025 results and further lowered 2025 guidance were "driven by a rigorous analysis of the company conducted during the third quarter and represent a critical and necessary reset."

33. Defendant Lyon gave an extensive explanation of the "rigorous analysis" that Fiserv conducted of itself. He stated:

> During the third quarter, my first full quarter as CEO, I worked with a management team and several external advisers to conduct a rigorous analysis of the company's operations, technology, financials and forecasting including thousands of client and employee meetings and external benchmarking. As the new CEO, it was natural for me to push our team to think critically about our businesses and objectively assess long-term value drivers, competitive strengths and weaknesses and ultimately, how we communicate with the investment community. The analysis was integrated into our annual strategic planning process, which starts every August and continues into the fall, with ongoing communication and interaction with our Board of Directors.

34. Defendant Lyon continued, explaining that "[o]ne of the key takeaways from our analysis is that Fiserv's growth and margin targets need to be reset." The reset was "driven by a

combination of 4 factors, including slowing cyclical growth in Argentina, the recalibration of optimistic growth assumptions in the original guidance, the impacts of certain deferred investments and the deprioritization of short-term revenue and expense initiatives."

35. With respect to Fiserv's "recalibration" of its organic growth assumptions, Defendant Lyons explained that while the Company's original 2025 organic revenue growth guidance assumed a slowdown in its Argentina business, "it also assumed that to compensate for the slowdown, our non Argentinian businesses would grow significantly faster than their historical mid-single-digit range."

36. Defendant Lyons said that "[i]n July, as part of [his] transition as CEO, we revised down some of these elevated expectations with a specific focus on critical new product launches, to better reflect what was achievable based on the work we had completed at the time. However, as we pursued a much broader and deeper full company analysis in Q3, it became clear that there were incremental assumptions embedded in our guidance, including outsized business volume growth, record sales activity and broad-based productivity improvements, all of which would have been objectively difficult to achieve even with the right investment and strong execution."

37. As to the "impacts of certain deferred investments," Defendant Lyons stated that "over the last few years, decisions to defer certain investments and cut certain costs, improved margins in the short term, but are now limiting our ability to serve clients in a world-class way, execute product launches to our standards and grow revenue to our full potential."

38. With respect to the "the deprioritization of short-term revenue and expense initiatives," Defendant Lyons admitted that "Fiserv's recent results have increasingly relied on short-term initiatives," which "place too much emphasis on pursuing in-quarter results as opposed to building long-term relationships by prioritizing business that both meets our clients' needs and

comes with high recurring revenue." Because of this, Defendant Lyons explained that Fiserv "made the decision to deprioritize the short-term revenue and expense initiatives which, of course, has some near-term impact on our growth and profitability."

39.     During the October Earnings Call, an analyst asked Defendant Lyons "[h]ow long was Fiserv over-earning with deferred investments and this focus on short-term revenue and expense initiatives that you called out?"

40.     Defendant Lyons responded that "in the 6 months I've been here, obviously, we've made some recalibrations last quarter, which were more focused on some of the big projects being relatively new in the seat. Some of the stuff we saw coming out of Q2 prompted the analysis that we did, which was a much broader and more rigorous analysis included a broader group of people here and external advisers, and we looked at every part of the company."

41.     Later during the October Earnings Call, an analyst followed up on these remarks as to the Financial Services business, asking: "I want to ask about the third quarter. You trimmed the full year guide 3 months ago when you were 1 month into the quarter. At the time, I think we heard that the team kind of under -- re-underwrote everything. So trying to kind of figure out, and I know you talked about many of the drivers here, like how could things change so dramatically in 2 months in a segment, which is by definition, somewhat of a recurring segment. So also trying to figure out kind of the -- why wasn't there like that much visibility into this level of revenue weakness intra quarter?"

42.     Defendant Lyons responded that "in July, roughly 10 weeks into the job, no excuses, but I focused on underwriting some of the major projects. We talked about those that were driving growth in the company's original 10% to 12% guidance, some of the bigger projects we talked about. We've successfully reunderwrote those and their performance since then has largely

remained on track as more financial surprises emerged over the -- in the start of Q3, that prompted not just the annual strategic planning process, but this much more rigorous review into our financials. And that was also driven by some of the stuff we're hearing from our clients."

43.     Defendant Lyons further explained that the "analysis not only uncovered some additional assumptions that needed to be revisited either stuff that was either out of our control, the macro stuff, industry stuff that we had assumed in the company's original guidance to go one way in a pretty deliberate manner. Then there are a whole bunch of embedded assumptions away from the major projects that even with strong execution would have been hard to do all of them simultaneously and successfully broad-based productivity initiatives, significant record -- embedded record sales activities and then stretch revenue numbers on top of it."

44.     Defendant Lyons continued, stating that there was a series of initiatives and that, "[a]gain, we've gone through it, but there were a series of initiatives that were client customers businesses always have these that were more short term driven in nature, that were a big part of the back half of the year to get to the guidance. And as I got a more fulsome understanding of those that obviously prompted some dissatisfaction with the way we do the process and we've made leadership changes around that and giving you today what we believe is a solid tangible baseline to grow from."

45.     Finally, Defendant Lyons concluded that "what was in the original 10% to 12% guidance that have worked through it. It took me 5 or 6 months, but I'm confident today the numbers you have represent who we are structurally as a company, and we've given you the outlook from which we can grow at and put together a team that's going to execute the hell out of the business, and it's a great business to run."

46.     The market reacted to Fiserv's reduced guidance, the October Press Release and the October Earnings Call by pummeling Fiserv's shares, which cratered nearly 45% on October 29 and declined an additional 7.6% on the following day, October 30, 2025, as the market continued to absorb the information disclosed on October 29, 2025.

<u>**FALSE AND MISLEADING STATEMENTS**</u>

47.     On July 23, 2025, Fiserv filed a Form 8-K with the SEC attaching the July Press Release.  The Form 8-K was signed by Defendant Hau.  The July 23 Press Release stated, under the heading "Outlook for 2025," that "Fiserv refine[d] organic revenue growth outlook to approximately 10% and adjusted earnings per share to $10.15 to $10.30, representing growth of 15% to 17%, for 2025."

48.     The July Press Release quoted Defendant Lyons stating, "We made several refinements to our guidance based on our year-to-date performance and current business activity levels" and that Fiserv was "encouraged by [its] strong pipeline, recent client wins, and the quality of our strategic initiatives, and expect to deliver Fiserv's 40th consecutive year of double-digit adjusted earnings per share growth."

49.     During the July Earnings Call, Defendant Lyons stated that Fiserv: (i) "refined [its] full year organic revenue growth guidance to approximately 10%, which is at the low end of [its] guidance range"; and (ii) "rais[ed] the bottom end of [its] adjusted earnings per share guidance range to $10.15 from $10.10, while maintaining the high end of the range at $10.30," based on its "revised ramp in revenue growth in the back half, continued margin improvement and the increased share repurchase guidance."

50.     The foregoing statements in Paragraphs 47 through 49 were materially false and misleading when made because, as Defendant Lyons later admitted during the October Earnings Call, Fiserv's organic growth guidance (and, in turn, its EPS guidance) included "assumptions,"

such as "including outsized business volume growth, record sales activity and broad-based productivity improvements, all of which would have been objectively difficult to achieve even with the right investment and strong execution."

51.     During the July Earnings Call, Defendant Lyons stated that Fiserv's "updated guidance reflects the fact that some [product] launches and [strategic] initiatives are taking longer than [Fiserv] had planned," but that the Company was "confident that [it] will capture the full strategic and financial benefits and only the timing of realizing them has been extended."

52.     During the July Earnings Call, Defendant Lyons also stated that Fiserv was "still confident [the Company would] get the full financial and strategic benefits of all those initiatives. And it's just a matter of timing. And again, we feel very good about them. The pipelines around the products that we're coming to market with are very strong. The clients want them. The technology is good. So we feel very good about it."

53.     Defendant Lyons further represented during the July Earnings Call that "[t]here isn't a quality issue" with these projects and initiatives.  He also described those projects and initiatives as "very strong."

54.     The foregoing statements in Paragraphs 51 through 53 were materially false and misleading when made because, as Defendant Lyons would later admit during the October Earnings Call, "Fiserv's . . . short-term initiatives" "place[d] too much emphasis on pursuing in-quarter results as opposed to building long-term relationships by prioritizing business that both meets our clients' needs and comes with high recurring revenue."  Because of this, Defendant Lyons explained that Fiserv "made the decision to deprioritize the short-term revenue and expense initiatives."  Thus, it was materially false and misleading for Defendant Lyons to have claimed

during the July Earnings Call that the issue with the Company's new initiatives and products was merely one of "timing" and that there was not a "quality issue" with those initiatives and products.

55. During the July Earnings Call, Defendant Lyons stated that the list of Fiserv's projects and initiatives was "granular" and thus he "had the ability to re-underwrite, study all of [the Company's] initiatives, and they are great initiatives," but "[i]t's just a matter of the timing of getting them to market."

56. Similarly, Defendant Lyons stated during the July Earnings Call that Fiserv "had a great chance to re-underwrite them," i.e., its initiatives and new products, "restudy them, and they're good. They're really great products."

57. The foregoing statements in Paragraphs 55 and 56 were materially false and misleading when made because, as Defendant Lyons would later admit during the October Earnings Call, the "re-underwrit[ing]" of projects and initiatives that he discussed during the July Earnings Call in reality "focused" only "on some of the big projects" and was not a comprehensive review of Fiserv's new initiatives and projects. When that comprehensive review was ultimately conducted during the third quarter of 2025, Defendant Lyons conceded that the review found that those initiatives and projects "place[d] too much emphasis on pursuing in-quarter results as opposed to building long-term relationships by prioritizing business that both meets our clients' needs and comes with high recurring revenue." Based on this conclusion, Defendant Lyons explained during the October Earnings Call, Fiserv "made the decision to deprioritize the short-term revenue and expense initiatives."

**THE TRUTH EMERGES**

58. As set forth above, in the October Press Release and during the October Earnings Call, Fiserv disclosed to the market reduced 2025 EPS and organic revenue growth guidance. The Company also admitted that its prior guidance and statements in the July Press Release and during

the July Earnings Call were based on "assumptions" "including outsized business volume growth, record sales activity and broad-based productivity improvements, all of which would have been objectively difficult to achieve even with the right investment and strong execution." In addition, Fiserv disclosed that it had during the third quarter conducted a full review of its new initiatives and products—conceding that the prior "re-underwrit[ing]" was incomplete—and "made the decision to deprioritize the short-term revenue and expense initiatives."

59. On this news, the price of Fiserv's common stock plummeted 44% ($55.57 per share) from a closing price of $126.17 per share on October 28, 2025 to a closing price of $70.60 on October 29, 2025.

60. The price of Fiserv's common stock also declined 7.6% ($5.41 per share) on October 30, 2025, as the market continued to absorb this news, closing at $65.19 per share.

## CLASS ACTION ALLEGATIONS

61. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Fiserv securities between July 23, 2025 and October 29, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

62. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, millions of Fiserv's common shares traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Fiserv or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' actions as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Fiserv; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

67. The market for Fiserv's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Fiserv's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's securities and market information relating to Fiserv, purchased Fiserv securities, and have been damaged thereby.

68. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Fiserv's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Fiserv's business, operations, and prospects as alleged herein.

69. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fiserv's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

70.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

71.     During the Class Period, Plaintiff and the Class purchased Fiserv's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

72.     As alleged herein, Defendants acted with scienter since Defendants: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fiserv, their control over, and/or receipt and/or modification of Fiserv's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fiserv, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE
(FRAUD-ON-THE-MARKET DOCTRINE)**

73.     The market for Fiserv's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Fiserv's securities traded at artificially inflated prices during the Class Period.  On

July 23, 2025, the Company's share price closed at a Class Period-high of $143.00 per share. Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of Fiserv's securities and market information relating to Fiserv, and have been damaged thereby.

74.     During the Class Period, the artificial inflation of Fiserv's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made materially false and/or misleading statements about Fiserv's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Marex and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's securities.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchased the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

75.     At all relevant times, the market for Fiserv's securities was an efficient market for the following reasons, among others:

(a)     Fiserv's securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Fiserv filed periodic public reports with the SEC;

(c)     Fiserv regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Fiserv was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace.

76. As a result of the foregoing, the market for Fiserv's securities promptly digested current information regarding Fiserv from all publicly available sources and reflected such information in Fiserv's securities price. Under these circumstances, all purchasers of Fiserv's securities during the Class Period suffered similar injury through their purchases of Fiserv's securities at artificially inflated prices and a presumption of reliance applies.

77. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

78. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fiserv who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

79.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

80.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Fiserv's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

81.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fiserv's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

82. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails and wires, engaged and participated in a continuous course of conduct to conceal adverse material information about Fiserv's financial well-being and prospects, as specified herein.

83. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fiserv's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fiserv and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

84. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the

creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

85.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fiserv's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

86.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Fiserv's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in

which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Fiserv's securities during the Class Period at artificially high prices and were damaged thereby.

87.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Fiserv was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Fiserv securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

88.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

90.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

91.     Individual Defendants acted as controlling persons of Fiserv within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

23

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

93.     As set forth above, Fiserv and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's Common stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 4, 2025                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Amanda F. Lawrence
Amanda F. Lawrence
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 531-2645
alawrence@scott-scott.com

Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
Mandeep S. Minhas (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
mminhas@scott-scott.com

*Counsel for Plaintiff Cypanga Sicav SIF*
*and the Putative Class*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Jerome Tordo, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Executive Officer of Cypanga Sicav SIF. I am authorized to make legal decisions on behalf of Cypanga Sicav SIF.

2. I have reviewed the Complaint for Violations of Federal Securities Law and authorize its filing.

3. Cypanga Sicav SIF is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period (as defined in the Complaint), Cypanga Sicav SIF purchased and/or sold the security that is subject of the Complaint as set forth in the attached Schedule A.

5. Cypanga Sicav SIF did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6. Cypanga Sicav SIF has not sought to serve or served as a representative party in a class action that was filed under federal securities laws within the three-year period prior to the date of this Certification.

7. Cypanga Sicav SIF will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

Docusign Envelope ID: 84FE00C6-F72A-4148-8F94-610D2AC413B0

I declare under penalty of perjury, under the laws of the United States of America, the foregoing is true and correct this 4 day of November, 2025.

CYPANGA SICAV SIF

Signé par :

Jerome Tordo
2F3DF32A3A6E444...

Jerome Tordo
Chief Executive Officer

# Schedule A

**FISERV INC**                     **Ticker:**   **FI**      **Cusip:**   **337738108**
Class Period: 07/23/2025 to 10/29/2025

**Cypanga Sicav SIF**

|               | DATE       | SHARES | PRICE    |
|---------------|------------|--------|----------|
| **Purchases:** | 7/23/2025  | 3,473  | $141.77  |
|               | 7/31/2025  | 1,233  | $139.87  |
|               | 9/13/2025  | 2,173  | $134.22  |
|               | 10/21/2025 | 1,681  | $126.02  |